ORDERED.

**Dated:  November 01, 2018**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| TAYLOR, BEAN & WHITAKER ) | |
| MORTGAGE CORP., ) | Case No. 3:09-bk-07047-JAF |
| REO SPECIALISTS, LLC, and ) | Case No. 3:09-bk-10022-JAF |
| HOME AMERICA MORTGAGE, INC., ) | Case No. 3:09-bk-10023-JAF |
| ) | (Jointly Administered Under |
| Debtors. ) | Case No. 3:09-bk-07047-JAF) |
| ) | |
| ) | |
| Neil F. Luria, as Trustee to the TAYLOR, ) | |
| BEAN & WHITAKER PLAN TRUST, ) | |
| ) | Adv. No. 3:11-ap-00657-RCT |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| ADP, Inc. ) | |
| Defendant. ) | |

## **MEMORANDUM DECISION**

Shortly after federal agents executed a search warrant at its headquarters, Taylor, Bean &

Whitaker Mortgage Corp. ("TBW") filed for relief under Chapter 11 of the Bankruptcy Code[1] on

August 24, 2009.[2]  The bankruptcy court confirmed a liquidating chapter 11 plan in 2011 and

---

[1] Statutory references are to 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code"), unless otherwise stated.
[2] Case No. 3:09-bk-07047-JAF (the "Main Case" or "MC") Doc. 1.

appointed Neil F. Luria to serve as the plan trustee (the "Trustee").[3]  The Trustee then filed a number of lawsuits, including this adversary proceeding against TBW's payroll service provider ADP, Inc. (now known as ADP, LLC) ("ADP").

From January 2006 to August 2009, ADP provided payroll services for TBW and its subsidiaries and affiliates, that included calculating the taxes owed to federal, state, and local entities based upon the gross payroll information uploaded, disbursing net wages and garnishments, and remitting withholdings to the applicable taxing authorities (collectively, the "Payroll Services").[4]  The Trustee seeks to avoid and recover more than $34 million paid to ADP for the Payroll Services (the "Transfers").[5]  The Trustee advances various theories to avoid these Transfers under both bankruptcy and state fraudulent transfer laws.  But, at its core the Trustee's recovery of the Transfers relies on his characterization of ADP as an "initial transferee" under § 550 of the Code.

An initial transferee is generally liable to the bankruptcy estate for the amount or value of fraudulently transferred property.  A plain reading of § 550(a)(1) might hold those who facilitate an avoided fraudulent transfer, such as a bank or law firm, just as liable as the ultimate recipient of the transferred property.  Indeed, § 550(a)(1) can almost be read to impose strict liability on such an initial transferee of an avoided fraudulent transfer.

---

[3] *See* MC Doc. 3420 ¶ 68 (Order Confirming Third Am. and Restated Joint Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors).
[4] Doc. 168, Ex. 42 (Potter-Levane Dep. Tr. 118:17-22, Nov. 16, 2017); TBW-ADP-1-00000007-8; TBW-ADP-1-00000011-18 (MSA Annex B § 1.1, Annex C § 1.1, Annex T § 1.1, Annex Z).
[5] Doc. 130 (Amended Complaint to Avoid Preferential and Fraudulent Transfers and to Recover Property Transferred Pursuant to 11 U.S.C. § 550 (the "Complaint")).  Counts II-VII seek to avoid and recover fraudulent transfers pursuant to §§ 544, 548(a)(1)(A), (B) and §550 of the Code and Fla. Stat. §§ 726.105(1)(a), (b) and § 726.106(1).  Count I of the Complaint asserts a preference claim pursuant to § 547(b) of the Code for fees paid to ADP for services rendered and is the subject of a separate motion and written decision.

To mitigate against such a harsh and inequitable interpretation of § 550(a)(1), the Eleventh Circuit created the "mere conduit" exception to initial transferee liability.[6] This judicially crafted exception is based on equitable considerations and is designed to protect those who simply and innocently facilitate the transfer, but do not actually end up with the transferred property.[7] Accordingly, courts are directed to look at all of the circumstances surrounding a transaction and to be practical and fair in assessing initial transferee liability.[8]

So far, the Eleventh Circuit has invoked the mere conduit exception to protect the following initial transferees from liability: (i) a financial institution handling and making payments from deposit accounts;[9] (ii) the Internal Revenue Service handling tax payments and refunds;[10] and (iii) an insurance broker handling payments earmarked for insurance premiums.[11] In each case, the initial transferee was found to be a mere conduit because it had no legal control over the money transferred but instead had simply passed it on. In addition, the mere conduit was also found to be innocently unaware of the potentially fraudulent nature of the transfers.

The Eleventh Circuit refused, however, to extend the mere conduit exception to an attorney who paid out money from his trust account as directed by his unscrupulous client.[12] The critical difference being that this attorney was not so unaware of the fraudulent nature of the transfers.[13] This was also true in the case of an avoidance defendant who "had intimate and thorough knowledge of the transactions and their desired [fraudulent] effect."[14]

---

[6] *See Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312 (11th Cir. 2010) ("*Harwell*") (explaining the evolution of the "mere conduit" defense).

[7] *Id.* at 1322-23.

[8] *Menotte v. USA (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1349-50 (11th Cir. 2014) ("*Custom Contractors*").

[9] *Nordberg v. Société Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988) ("*Société Generale*").

[10] *Custom Contractors*, 745 F.3d at 1342.

[11] *Andreini & Co. v. Pony Exp. Delivery Services, Inc. (In re Pony Exp. Delivery Services, Inc.)*, 440 F.3d 1296 (11th Cir. 2006) ("*Pony Express*").

[12] *Harwell*, 628 F.3d at 1312.

[13] *Id.*

[14] *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Serv., Inc.)*, 408 F.3d 689, 706 (11th Cir. 2005).

Thus, to qualify as a mere conduit in this circuit, the initial transferee of a debtor's fraudulently transferred property must show "(i) that they did not have control over the assets received, *i.e.*, that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (ii) that they acted in good faith and as an innocent participant in the fraudulent transfer."[15]

The issue here is whether ADP, a payroll processing company, was a mere conduit when it processed the Transfers pursuant to TBW's instructions, notwithstanding the fact that the Transfers may have been part of a "great big fraud."[16]

The Trustee and ADP have filed and fully briefed three separate motions for partial summary judgment related to the mere conduit defense.[17]   Because the applicable law directs this court to take a "flexible, pragmatic, equitable approach" which considers all aspects of the transactions,[18] all three motions will be considered together.

## JURISDICTION

This court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).

## UNDISPUTED FACTS

*The TBW Entities*

TBW was a privately held company incorporated in 1991.  Lee Farkas ("Farkas") controlled 79.2% of TBW directly, 14.7% through LBF Holding, LLC, and 6.1% through Taylor,

---

[15] *Harwell,* 628 F.3d at 1323 (emphasis in original).

[16] Doc. 173, Ex. B (Workman Dep. Tr. 19:21-22, 20:1-2, Dec. 14, 2017).  Donald Workman is an attorney who first appeared as counsel for a creditor that became chair of the creditors' committee in the administratively consolidated chapter 11 cases.  He testified here as the Trustee's corporate designee under Fed. R. Civ. P. 30(b)(6) and stated that TBW was not embroiled in a Ponzi Scheme, but rather a "great big fraud."

[17] Docs. 137, 135, 156, 158, 157, 160, 161, 167, 168, 173, and 175.

[18] *Custom Contractors*, 745 F.3d at 1350.

Bean & Whitaker ESOP.[19]   Farkas served as TBW's Chairman of the Board.[20]   TBW had numerous subsidiaries and affiliates, including the entities for whom the Transfers that are the subject of this adversary proceeding were made (collectively, the "TBW Entities"), which were owned, in whole or in part, either directly or indirectly, by Farkas.[21]

Until its sudden collapse in 2009, TBW was the largest independent mortgage lender in the United States.   TBW operated three primary lines of business:   a mortgage loan origination business, a mortgage loan sales business, and a mortgage loan servicing business.   TBW's business model was based on the premise that the mortgage loans it originated or purchased would be sold within days or weeks of origination.[22]

TBW's Payroll and Human Resources Departments managed, respectively, payroll and human resources for all the TBW Entities.[23]   TBW's Accounting Department kept the general ledgers for all of the TBW Entities although, beginning in or around 2005, the affiliates' books were kept by TBW employees working out of the offices of TBW affiliate Brick City Accounting rather than at TBW's headquarters.[24]   Margaret Potter-Levane ("Ms. Potter-Levane") was TBW's payroll manager from 1999 to 2009.   She had approximately 30 years of experience in payroll management.[25]

---

[19] Doc. 168, Ex. 2 (MC Doc. 2144 (TBW's Second Amended and Restated Disclosure Statement)).

[20] *See* Doc. 168, Ex. 12 (TBW-ADP-1-00000001-2).

[21] Doc. 168, Ex. 3 (Expert Report of Wilen & Pederson, Exhibit 12 (Summarizing Amended Exhibit B to Complaint by Entity)); MC Doc. 2144, pp.16-27 (TBW's Second Amended and Restated Disclosure Statement); MC Doc. No. 481 (Schedule B); TBW-ADP-4-00000312-13; TBW-ADP-4-00023450; TBW-ADP-4-00046663 at Schedule 2; TBW-ADP-4-00044282 (filed under seal pursuant to the Amended Protective Order Governing Confidential Information and Clawback Procedures (the "Protective Order") (Doc. 91)).

[22] Doc. 168, Ex. 3 (MC Doc. 2144, pp. 17, 19 (TBW's Second Amended and Restated Disclosure Statement)).

[23] Doc. 168, Ex. 4 (Potter-Levane Dep. Tr. 16:18-17:4, 20:11-16, Nov. 16, 2017).

[24] Doc. 168, Ex. 5 (Emig Dep. Tr. 25:11-18, 61:2-4, June 19, 2014; Lee Dep. Tr. 19:15-20, 21:11-20, 22:16-21, June 18, 2014).

[25] Doc. 168, Ex. 6 (Potter-Levane Dep. Tr. 11:6-14, Nov. 16, 2017).

*The ADP Master Services Agreement*

In April 2005, Ms. Potter-Levane contacted ADP about processing payroll for the TBW Entities.[26]  Shortly thereafter, Trisha Bush ("Ms. Bush"), an ADP District Sales Manager, met with Ms. Potter-Levane and TBW's Human Resources Director, Robb Young, to discuss TBW's payroll and human resources needs and to provide an overview of ADP payroll and human resources technologies.[27]  Ms. Potter-Levane told Ms. Bush that TBW wanted Payroll Services for multiple separate companies with different federal employer identification numbers that would require separate checks.[28]  Following the meeting, Ms. Potter-Levane decided to hire ADP to process payroll for the TBW Entities.[29]

On May 3, 2005, Farkas executed an ADP Master Services Agreement on behalf of TBW, which incorporated several Annexes, including: A (General Terms and Conditions), B (Payroll Services), C (Tax Filing Services), S (PayForce), T (TotalPay), and Z (Pricing), and which was modified by an addendum dated May 3, 2005, and an amendment dated October 1, 2005, that added Annex O (Time and Labor Management Services) and the pricing for Annex O services to Annex Z (Pricing) (collectively, the "MSA").[30]  Farkas, Ms. Potter-Levane, and ADP intended and understood that, pursuant to the MSA, ADP would provide Payroll Services to all the TBW Entities under a single contract.[31]

---

[26] Doc. 168, Ex. 7 (Potter-Levane Dep. Tr. 55:6-56:12, June 17, 2014).

[27] Doc. 168, Ex. 8 (Bush Dep. Tr. 9:19-11:20, 13:3-14:9, 28:22-29:25, 30:11-13, 31:9-10, 31:16-18, 31:20-23, Feb. 8, 2017).

[28] Doc. 168, Ex. 9 (Potter-Levane Dep. Tr. 69:13-70:3, 70:20-24, 72:25 -73:3, 76:24-77:13, 151:14-25, June 17, 2014).

[29] Doc. 168, Ex. 10 (Potter-Levane Dep. Tr. 14:12-14, 15:13-20, Nov. 16, 2017).

[30] Doc. 168, Ex. 12 (TBW-ADP-1-00000001-24).

[31] Doc. 168, Ex. 13 (Potter-Levane Dep. Tr. 85:7-86:24, 151:14-25, June 17, 2014; Bush Dep. Tr. 87:3-23, 139:12-15, Feb 8, 2017; ADP-000005607-10; ADP-000005821-22; ADP-000006292; ADP-000006321-22; ADP-000006324 - 6450; ADP-000077290) (filed under seal pursuant to the Protective Order (Doc. 91)).

On May 12, 2005, ADP received a background history report from Dun & Bradstreet that showed TBW to be financially sound.[32]

As of mid-January 2006, the following TBW Entities had been set up for Payroll Services: TBW, Home America Mortgage, Thunderflower, LLC, Nada Restaurant Group (later known as Dine Design, Inc.), Compass Health & Fitness, Chisholm Properties of Atlanta, LLC, Quality Title, LLC, US Family Insurance, and 24/7 Call Capture, LLC.[33]

ADP regularly deals with large employers with thousands of employees and multiple businesses. Accordingly, the ADP representatives who interacted with TBW did not find the diversity of TBW's business interests remarkable. ADP does not involve itself in a client's business decision on "what companies they open and who they pay."[34]

Between 2006 and 2009, ADP provided Payroll Services to the TBW Entities pursuant to the MSA. As explained by Kristin Walle ("Ms. Walle"), a Vice President of Global Money Movement and Compliance, Implementation and Client Experience at ADP:

> A.      So if you have engaged with ADP for payroll -- you are outsourcing your payroll, you are providing us the information that -- for the associates you want paid. And you would be giving us that information.
>
> So, then, what we can do is ensure that your employees are paid where you've instructed us to pay. And then the related state -- the related payroll taxes associated with those transactions would go to the appropriate taxing authorities, based upon the information you have provided as to where those employees reside.
>
> Q.      And -- and for clients that use that service, they depend on ADP and its systems to actually do all the calculations and make the disbursements to the tax authorities; correct?

---

[32] Doc. 168, Ex. 14 (Dun & Bradstreet Report).

[33] Doc. 168, Ex. 15 (Potter-Levane Dep. 88:15–89:6, June 17, 2014; ADP-000005607–10; ADP-000005821-22; ADP-000077290) (filed under seal pursuant to the Protective Order (Doc. 91)).

[34] Doc. 168, Ex. 16 (Bush Dep. Tr. 67:23-68:7, 86:6-7, 137:13-23, 146:19-22, Feb. 8, 2017; Rambo Dep. 53:4-14, 61:9-24, Feb. 7, 2017; ADP 000004057; ADP 000004059) (filed under seal pursuant to the Protective Order (Doc. 91)).

> A.     Correct.[35]

ADP received each Transfer subject to specific client instructions.  Again, Ms. Walle explained:

> A.     The client provides me with instructions that I process. And so the client completes the payroll and determines what that payroll may be. Provides that -- those instructions along with the payroll to ADP, those -- that payroll is processed and the related financial transactions from a disbursements perspective, and the funding of that is -- I facilitate that. So I'm a conduit for the client to make their payroll payments versus doing that on their own.
> . . .
> A.     I facilitate payments as directed by the clients that I serve. And so I collect funds, and I disburse funds according to the instructions provided to me by the client.[36]

In sum, ADP was contractually obligated to use the Transfers as directed by TBW to provide Payroll Services.

*The "Client Group"*

Annex A (General Terms and Conditions) to the MSA defines the "Client Group" as the "Client, Client's majority owned subsidiaries and affiliates of Client."[37]  Annex A also states that "affiliates are listed in Section 1 of Annex Z" (Pricing).  Section 1 of Annex Z defines "Client Group" to mean "Taylor, Bean & Whitaker Mortgage Corporation".[38]  As described by ADP's President of National Account Services, Jay C. Rising ("Rising"), it is "typical" in MSAs with clients who have more than 1000 employees for ADP to identify only the parent company in Section 1 of Annex Z, while providing services to the entire enterprise.[39]

[35] Doc. 156, Ex. B (Walle Dep. Tr. 88:9-25); *see also* Ex. C (MSA Annex B § 1.1, Annex C § 1.1; Annex T § 1.1); Ex. B (Walle Dep. Tr. 58:12-16, 87:10–88:25).
[36] Doc. 156, Ex. B (Walle Dep. Tr. 63:11-20, 61:16-19).
[37] Doc. 168, Ex. 17 (TBW-ADP-1-00000003).
[38] Doc. 168, Ex. 18 (Bush Dep. Tr. 129:21-22, Feb. 8, 2017; TBW-ADP-1-00000003; TBW-ADP-1-00000014-18).
[39] Doc. 168, Ex. 19 (Rising Dep. Tr. 8:22-9:4, 14:3-6 and 22:4-25:14, June 6, 2017).

*TBW's Payroll Process*

At the root of the Trustee's claims are wages, garnishments, and taxes paid by TBW that passed through ADP to or on behalf of employees of various TBW Entities. Due to its size and organizational structure "[p]ayroll processing at TBW [was] a continuous and procedure-intensive routine."[40] Accordingly, an understanding of how TBW processed its payroll and how each payroll was recognized on TBW's accounting records is necessary.

*Adding a New TBW Entity*

ADP does not execute a new MSA when a client adds a new business or company; rather, the MSA applies to every business established by the client.[41] When TBW acquired a subsidiary or affiliate, Ms. Potter-Levane or her assistant, Jessica Vega ("Ms. Vega"), asked ADP to assign a "Company Code" to the new entity.[42] A Company Code is an alpha-numeric code assigned to a company for use in ADP's systems.[43] All disbursements of wages, taxes, and garnishments are reported to the applicable taxing authorities under the federal employee identification number ("FEIN") for the entity under whose Company Code the disbursements are made. Each individual on whose behalf disbursements are made under a particular Company Code receives an IRS Form W-2 or 1099 under the FEIN for that Company Code. Each Company Code may be associated with only one FEIN.[44] A parent company can have one or more Company Codes. Ms. Potter-Levane described this type of organizational structure as "one mother with lots of children."[45]

---

[40] Doc. 168, Ex. 82 ¶ 15 (Expert Report of Wilen & Pederson).
[41] Doc. 168, Ex. 34 (Bush Dep. Tr. 86:24–87:23, Feb. 8, 2017; Rising Dep. Tr. 8:22-9:4, 14:3-6 and 22:4-25:14, June 6, 2017; Potter-Levane Dep. Tr. 85:21-86:24, June 17, 2014).
[42] Doc. 168, Ex. 36 (Potter-Levane Dep. Tr. 29:13–30:16, 31:2-10, Nov. 16, 2017).
[43] Doc. 168, Ex. 22 (ADP-000016667; ADP-000007754) (filed under seal pursuant to the Protective Order (Doc. 91)).
[44] Doc. 168, Ex. 24 (Potter-Levane Dep. Tr. 36:18-38:9, Nov. 16, 2017; (ADP-000004063; ADP-000019702-04; ADP-000019713) (filed under seal pursuant to the Protective Order (Doc. 91)).
[45] Doc. 168, Ex. 21 (Potter-Levane Dep. Tr. 86:13-15, June 17, 2014).

Before assigning a Company Code, ADP asked for the following information about the new entity:

- Legal name/address/FEIN
- Number of employees and pay frequency
- Whether this is a newly acquired company or a shifting of existing employees from an existing code
- If a new company, is an existing company code set-up to be copied?  If so, which one?
- Whether the banking information is the same or different than the code to be copied.

ADP also required that TBW sign and return the following forms on behalf of the new entity:

- RAA -- Reporting Agent Authorization/State Limited Power of Attorney & Tax Information Authorization.
- IRS Proof of FEIN to support the FEIN on the RAA.
- Proof of State Income Tax Number.
- Federal State Local Supplemental Authorization Form.
- Tax Filing Service Federal State Local Authorization Form.
- Tax Service Setup Transmittal Form.[46]

When asked why ADP needed the RAA, Ms. Potter-Levane explained that "[t]he reporting of the agent authorization, the state Limited power of attorney and tax information authorization is because we hired ADP to deduct, hold, escrow, and pay applicable taxes for each employee for each state.  So we had to give them a power of attorney, we were saying to ADP as TBW, as TBW employer we're giving you the right to deduct these taxes on our behalf and send to the state, their applicable state."[47]

ADP required the same information for each new company and could not have provided Payroll Services for the TBW Entities without these forms.[48]

---

[46] Doc. 168, Ex. 23 (Rambo Dep. Tr. 63:15-25, Feb. 7, 2017; (ADP-000077132 – 35) (filed under seal pursuant to the Protective Order (Doc. 91)).
[47] Doc. 168, Ex. 37 (Potter-Levane Dep. Tr. 33:21-34:10, Nov. 16, 2017).
[48] Doc. 168, Ex. 37 (Potter-Levane Dep. Tr. 32:2-6; 34:16-19, Nov. 16, 2017).

*Preparing Payroll for Processing*

The payroll process began with TBW's Human Resources Department ("HR Department").  The HR Department was responsible for maintaining employee and company information on behalf of the TBW Entities, including adding new employees and companies as well as transferring employees between companies.[49]  The HR Department created a "Master File" for each of the TBW Entities that included each entity's Company Code, employees, and the employees' demographic information.[50]  An entity's employees were also linked to their employer by an internally generated Location Code.  An employee's Location Code remained the same unless changed by the HR Department.[51]  After verifying the accuracy of the information in the Master Files, the HR Department uploaded the data to PayForce (ADP's payroll application) and then turned the process over to TBW's Payroll Department.[52]

The Payroll Department maintained the Payroll Master File in Excel to track hours and gross pay.[53]  Before each payroll, the Payroll Department updated the Payroll Master File with information provided by the HR Department, including new hires, terminations, transfers, payrate changes, and changes of address.  The Payroll Master File was password protected.[54]  The Payroll Department added all timecard, commission, bonus, and other pay information.  After the Payroll Department verified all of the entries, the spreadsheet was uploaded to PayForce.[55]

---

[49] Doc. 168, Ex. 26 (Potter-Levane Dep. Tr. 40:1-10, Nov. 16, 2017).

[50] Doc. 168, Ex. 27 (Potter-Levane Dep. Tr. 26:13 – 27:6, 27:24 - 28:16, Nov. 16, 2017).

[51] Doc. 168, Ex. 28 (Potter-Levane Dep. Tr. 21:8-14, 21:21–22:4, 27:5-10, 65:7-21, 67:19-23, 82:19-22, Nov. 16, 2017; (ADP-000004064; ADP-00007482-85; ADP-000006169-86) (filed under seal pursuant to the Protective Order (Doc. 91)).

[52] Doc. 168, Ex. 29 (Potter-Levane Dep. Tr. 28:17-25, 45:1-10, Nov. 16, 2017); Ex. 82 ¶ 15 (Expert Report of Wilen & Pederson).

[53] Doc. 168, Ex. 82 ¶ 15, n.10.

[54] Doc. 168, Ex. 39 (Potter-Levane Dep. Tr. 41:1-42:7, 43:20–44:8, Nov. 16, 2017; (TBW-ADP-4-00920178) (filed under seal pursuant to the Protective Order (Doc. 91)).

[55] Doc. 168, Ex. 40 (Potter-Levane Dep. Tr. 45:1-10, Nov. 16, 2017; (TBW-ADP-4-00920178-79) (filed under seal pursuant to the Protective Order (Doc. 91)).

ADP processed the payroll and then generated a "Preview" (also called a "Statistical Summary Detail") that reported the amount of wages, garnishments, and taxes for each Company Code.[56]  The Payroll Master File was reconciled to the Preview for each payroll.  Discrepancies were identified and corrected by the Payroll Department.[57]  Only after the gross payroll totals were matched would the Payroll Department "accept" the payroll and upload the data from PayForce to ADP for processing.[58]  ADP did not process payroll for any of the TBW Entities except at the direction of Ms. Potter-Levane directly or through Ms. Vega.[59]

*Funding Payroll*

Once payroll was reconciled and approved, the Payroll Department requested wire transfers from TBW's Cash Management Group to fund the payroll.[60]  Ms. Potter-Levane used the amounts appearing on the Preview (*i.e.* total wages, total taxes, and total garnishments) to create both a Wire Transfer Instruction Form and a Wire Breakdown Form – one of each for wages, another of each for taxes/garnishments.[61]  The Wire Breakdown Form provided ADP with instructions for the application of TBW's payroll wires, including the total taxes, wages, and garnishments to be disbursed, the Company Code for the entity on whose behalf each of those amounts were to be disbursed, and the batch number of the corresponding Preview.[62]  Ms. Potter-Levane added the total to be wired and provided the Wire Transfer Instruction Form to Desiree

---

[56] *See e.g.*, Doc. 168, Ex 82 ¶ 15 n.10 at Ex. 1 (Previews for GCC and GCM for period ending 07/14/2006).

[57] Doc. 168, Ex. 82 ¶ 15 n.10.

[58] Doc. 168, Ex. 41 (Potter-Levane Dep. Tr. 44:19-25, 47:3-21, Nov. 16, 2017; (TBW-ADP-4-00920179) (filed under seal pursuant to the Protective Order (Doc. 91)).

[59] Doc. 168, Ex. 38 (Potter-Levane Dep. Tr. 123:11-21, June 17, 2014).

[60] Doc. 168, Ex. 82 ¶ 15.

[61] Doc. 168, Ex. 82 ¶ 17 at Ex. 2.

[62] Doc. 168, Ex. 43 (Potter-Levane Dep. Tr. 46:16-17, 48:1-17, 49:10-11, 49:22–53:19, 55:25–56:2, 56:12-16, 56:23–57:15, Nov. 16, 2017).

Brown ("Ms. Brown").  Ms. Brown was the head of TBW's Cash Management Group and was responsible for wiring the funds to ADP.[63]

When TBW hired ADP, Ms. Potter-Levane arranged for TBW to direct wire funds to ADP as opposed to having ADP debit the funds from TBW's bank account.  She chose this option because TBW had multiple bank accounts.[64]  Ms. Potter-Levane testified that she did not know how Ms. Brown determined the sources from which the funds were wired.[65]

Early on TBW and ADP recognized the possibility that ADP might need to issue refunds to TBW.  In late October 2005, ADP accepted TBW's banking instruction that "Colonial Bank Account [number 8030377314] will only be used for ADP tax refunds to TBW" as well as "TotalPay [net pay to employees] refunds to TBW."[66]  Additionally, Farkas signed a "Client Account Agreement and Authorization to Debit/Credit," dated January 27, 2006, that provided ADP with the same account number at Colonial Bank.  On the form is handwritten the following instructions:

> THE CLIENT IS SET UP AS A CONSOLIDATED DIRECT WIRE UNDER
> PARENT GCC. PLEASE ONLY USE THE ACCOUNT BELOW FOR REFUNDS
> . . .[67]

After ADP received the Transfers from TBW, ADP released the payroll and honored payroll checks and direct deposits and paid taxes.[68]  ADP then made available to TBW a "Text File" or "General Ledger Report" that provided details about the processed payroll down to the individual employee level.[69]

---

[63] Doc. 168, Ex. 44 (Potter-Levane Dep. Tr. 53:4-19, 56:3-5, 57:1-3, 61:2-5, Nov. 16, 2017).
[64] Doc. 168, Ex. 28 (Potter-Levane Dep. Tr. 22:5-25, Nov. 16, 2017).
[65] Doc. 168, Ex. 45 (Potter-Levane Dep. Tr. 61:15-17, Nov. 16, 2017).
[66] Doc. 168, Ex. 13 (ADP-000006373) (filed under seal pursuant to the Protective Order (Doc. 91)).
[67] Doc. 168, Ex. 13 (ADP-000077290 (filed under seal pursuant to the Protective Order (Doc. 91)) (the remainder of the sentence is cut-off).
[68] Doc. 168, Ex. 82 ¶ 15.
[69] Doc. 168, Ex. 46 (Emig Dep. Tr. 18:9-19, Nov. 17, 2017); Ex. 82 ¶ 15.
.

*TBW Post-Payroll Cost Accounting*

Each payroll for the TBW Entities was recorded on TBW's general ledger in a multistep process by the TBW Accounting Department.[70]  Because each wage wire initiated by TBW flowed through the TBW Accrued Salaries account, whether for TBW, a subsidiary, or an affiliate, the account was constantly adjusted by TBW to reclassify the payroll as either a salary expense or a receivable from a subsidiary or affiliate.[71]  ADP's expert explained why:

> In terms of general accounting concepts, the accrual account is normally credited first (i.e., an amount is due for a payroll) and then debited (when the check is issued).  TBW's accounting recognition appeared to be cash driven, whereby a wire was made to ADP first, and the accounting for the wire, to recognize either a payroll expense[] or an amount due, came after the wire had been issued.[72]

ADP's expert deemed TBW's internal reallocation of payroll from TBW to its subsidiaries and affiliates a complex process for two primary reasons.  First, different entities' payrolls were often funded together and paid to ADP in a single set of wires (one for wages, and one for taxes and garnishments).[73]

Second, TBW paid individuals who worked for a TBW subsidiary or affiliate under TBW's company code GCC and internally accounted for the payroll and benefits costs of those employees as the costs of the other TBW Entities ("Recharacterized Employees").[74]  Some of the Recharacterized Employees were TBW employees who helped establish a new TBW Entity.  They were paid as TBW employees until the new entity became operational and were then transferred to the new TBW Entity.[75]  Other times, Recharacterized Employees were transferred to TBW for benefits or licensing reasons, or their employment with a TBW Entity was terminated and they

---

[70] Doc. 168, Ex. 82 ¶ 16.
[71] Doc. 168, Ex. 50 (Emig Dep. Tr. 111:1-24, June 19, 2014); Doc. 168, Ex. 82 ¶ 19.
[72] Doc. 168, Ex. 82 ¶ 19 n. 16.
[73] Doc. 168, Ex. 82 ¶ 20.
[74] Doc. 168, Ex. 55 (TBW-ADP-4-00920178-80) (filed under seal pursuant to the Protective Order (Doc. 91)); Ex. 82 ¶ 21.
[75] Doc. 168, Ex. 56 (Potter-Levane Dep. Tr. 131:24-132:18, Nov. 16, 2017).

were hired by TBW.  The HR Department changed the employers in PayForce from the other TBW

Entities to TBW.  These transfers were not discussed with ADP.[76]

To allocate the GCC employees (who received W-2s from TBW) between TBW and the

subsidiaries and affiliates, the Accounting Department undertook a reallocation process.[77]  Every

pay period the Accounting Department would get a Text File from ADP.  Maureen Emig ("Ms.

Emig") in TBW's Accounting Department loaded the Text File into an Excel spreadsheet (the

"Journal File").  Ms. Emig then extracted subsidiary and affiliate payroll information to develop a

journal entry which was then entered into TBW's accounting system.[78]

For each payroll funded by TBW, subsidiaries and affiliates recorded the payroll on their

books as an expense and as a payable due to TBW.[79]  Conversely, TBW recognized a receivable

from each subsidiary or affiliate.  The receivable was reduced when the subsidiary or affiliate

reimbursed TBW for the payroll.[80]  TBW charged interest on funds advanced to its subsidiaries

and affiliates, including for payroll.[81]  Although this did not take place for all payrolls, the TBW

general ledger reflects reimbursements reducing (as credits) the various receivable account

balances.[82]  The net balance due from each subsidiary or affiliate was reflected on TBW's general

ledger, and on its consolidated financial statements and the TBW Board Financial Review

reports.[83]

---

[76] Doc. 168, Ex. 57 (Potter-Levane Dep. Tr. 86:9-13, 88:7-8, 88:25–89:18, 93:14-94:4, 97:11-23, 98:10-13, 101:18–
102:18, 103:12-14, 105:14–106:2, 132:13-25, 133:16-20, 134:19-23, Nov. 16, 2017; TBW-ADP-5-00094023-24
(filed under seal pursuant to the Protective Order (Doc. 91)).

[77] Doc. 168, Ex. 58 (Potter-Levane Dep. Tr. 95:15-21, Nov. 16, 2017); Ex. 82 ¶¶ 21-22.

[78] Doc. 168, Ex. 59 (Emig Dep. Tr. 126:10-11, 128:2-4, 129:15-130:4, 132:23-133:8, 133:23-134:25, 154:20-155:4,
155:18-24, June 19, 2014).

[79] Doc. 168, Ex. 82 ¶ 23.

[80] Doc. 168, Ex. 82 ¶ 25.

[81] Doc. 168, Ex. 52 (Emig Dep. Tr. 114:6-9, June 19, 2014).

[82] Doc. 168, Ex. 82 ¶ 24 at Ex. 3.

[83] Doc. 168, Ex. 82 ¶ 25.

Even though the ADP Text files identified TBW as the employer making the disbursements to and remitting withholdings on behalf of Recharacterized Employees, Ms. Emig accounted for such wages and taxes as those of other TBW Entities on TBW's internal books and records.  In so recording the payroll of the Recharacterized Employees, Ms. Emig did not believe she was facilitating a fraud.[84]

*ADP's Bank Account Structure:  The Flow of Funds*

ADP's bank structure has two primary components.   One component controls ADP's corporate funds ("ADP Funds"), which include fees paid by clients for the services provided by ADP as well as disbursements for ADP operational expenses.   The second component controls client funds held by ADP for the purpose of remitting payroll, taxes, and other similar transfers on behalf of its clients ("Client Funds").[85]   ADP's banking practices are disclosed in its parent company's SEC filings and in the relevant contract documents with its clients.[86]

ADP Funds are segregated from Client Funds via separate and independent bank accounts. As a matter of ADP policy and practice, ADP Funds are never in the same bank account or otherwise commingled in any manner with Client Funds.[87]   ADP does not use Client Funds for ADP's corporate operations.   Rather, "funds held for clients are utilized for the sole purpose of satisfying our client fund obligations."[88]   ADP clients, like TBW, are separately billed for services rendered.   ADP never takes its fees out of Client Funds.[89]

---

[84] Doc. 168, Ex. 60 (Emig Dep. Tr. 147:2-4, Nov. 17, 2017).
[85] Doc. 157, Ex. A (Affidavit of Michael Eberhard, sworn to Feb. 12, 2018, (hereafter "Eberhard Aff.") ¶ 4).
[86] *Id*. ¶ 10.
[87] *Id*. ¶ 5.
[88] *Id*. ¶ 11.
[89] *Id*. ¶ 9.

ADP clients are expected to fully fund their payrolls in advance.[90]  But if a client fails to fully fund its payroll, ADP may fund the shortfall with commingled Client Funds.[91]  ADP does not charge interest to its clients for this service.[92]

The MSA is consistent with these procedures.   ADP is contractually authorized to commingle TBW's funds with the funds of other ADP clients.  To identify each client's funds, ADP uses a funds control system that maintains general ledger entries by client and maintains an accounting for the aggregated Client Funds.[93]  The MSA also permits ADP to invest the money received from TBW and to keep the interest and income for ADP's own benefit.[94]

ADP regularly makes refunds to clients of Client Funds, at the request of clients and for various other reasons.[95]  As part of ADP's services, payroll funds received from TBW that were never cashed by employees were returned to TBW.[96]  TBW had the ability to reverse Full Service Direct Deposits up to five business days from the payroll check date.  TBW could also request ADP Check Stop Payments.[97]

ADP's handling of Client Funds is consistent with common practices within its industry.[98]

*"The Great Big Fraud"*

From 2002 through 2009, Farkas and certain other employees of TBW (collectively, the "Farkas Parties") engaged in a scheme to defraud, among others, Colonial Bank, Ocala Funding LLC, a mortgage lending facility owned by TBW ("Ocala"), Ocala's secured lenders and other creditors.

---

[90] *Id.* ¶ 6.
[91] *Id.* ¶ 7.
[92] *See* Doc. 157, Ex. B (Walle Dep. Tr. 111:2-6, Feb. 10, 2017).
[93] Doc. 157, Ex. B (Walle Dep. Tr. 113:23–114:1, Feb. 10, 2017, Ex. C (MSA Annex C § 2.)
[94] Doc. 157, Ex. C (MSA at Annex C, § 2; Annex T, § 2).
[95] Doc. 157, Ex. A ¶ 8.
[96] Doc. 168, Ex. 82 ¶ 8.
[97] Doc. 168, Ex. 13 (ADP-000006373 (filed under seal pursuant to the Protective Order (Doc. 91)).
[98] Doc. 157, Ex. A ¶ 13.

On August 3, 2009, in connection with an ongoing investigation of Colonial Bank, federal agents executed a search warrant at TBW's headquarters.  The next day, the United States Department of Housing and Urban Development suspended TBW's HUD/FHA origination and underwriting approval, Ginnie Mae terminated TBW's authority to act as a Ginnie Mae issuer and to service its $26 billion mortgage portfolio, and Freddie Mac terminated TBW's eligibility to sell loans and to service its $51.2 billion portfolio.  Terminations by these agencies dealt a death blow to TBW's business operation.  On the afternoon of August 5, 2009, TBW laid off approximately 2,000 employees, reduced its business operations to the minimum level believed necessary to preserve the value of its assets, and began planning for an orderly restructuring or liquidation of the company, resulting in the filing of the underlying chapter 11 bankruptcy.[99]

After confirmation of TBW's liquidating chapter plan, the Trustee brought suit in state court against TBW's accountants Deloitte & Touche, LLP ("Deloitte").  In his lawsuit, the Trustee outlines his understanding of the scope of the fraud and its coverup since 2002.  The Trustee further alleges that from 2002 through 2008, Deloitte purported to conduct an audit of each of TBW's fiscal year-end financial statements and incorrectly certified that TBW was a solvent viable company with financial statements free from material misstatements.  Finally, the Trustee alleges that for years Deloitte certified financial statements overstating assets and revenues and failed to detect the massive fraud orchestrated by Farkas.[100]  The Trustee and Deloitte have since settled.[101]

---

[99] MC Doc. 5659, Ex. B ¶ 8 (Declaration of Neil F. Luria, Chief Restructuring Officer for the Debtor, In Support of First Day Pleadings).  For a comprehensive description of the history of the Farkas Parties' fraudulent misconduct, *see generally* MC Doc. 2144, pp. 17-43.
[100] *See generally* Doc. 168, Ex. 80.
[101] Doc. 168, Ex. 2 ¶ 13.

*Actual Knowledge of "The Great Big Fraud"*

No one at ADP had actual knowledge of any fraudulent activity at TBW until the FBI raided TBW's headquarters in 2009. Ms. Bush, who continued to work with TBW after the execution of the MSA as a liaison between the client and customer service testified:

> Q:     [W]hen you were a district sales manager at ADP, did you know that certain people at TBW were involved in fraud?
>
> A:     No.
>
> Q:     When did you find out about -- did you ever find out about a fraud at TBW?
>
> A:     The day of the raid.
>
> Q:     Of the raid at TBW?
>
> A:     Yes.
>
> Q:     How did you find out that there was a -- that people at TBW were involved in fraud?
>
> A:     Robb Young [TBW's Director of Human Resources], who was my chief contact, told me that Federal agents came into their corporate offices and shut down their operations.[102]

Ms. Walle testified that she "would be surprised" if anyone at ADP "knew or had reason to know that there was a fraud occurring at TBW."[103] Ms. Potter-Levane testified that, after ADP received instructions on where to send funds received through its "fully automated" system, "ADP was out of the equation because they had no reason to know anything else."[104]

Ms. Potter-Levane, one of TBW's key contacts with ADP, testified that she never discussed with ADP any concerns regarding TBW's payroll processes, TBW's use of Location Codes, the funding of TBW's payrolls, or TBW's financial condition. Nor did she ever ask ADP to do

---

[102] Doc. 168, Ex. 63 (Bush Dep. Tr. 36:14-24, 124:20–125:8, Feb. 8, 2017).
[103] Doc. 168, Ex. 65 (Walle Dep. Tr. 24:24–25:4, Feb. 10, 2017).
[104] Doc. 168, Ex. 66 (Potter-Levane Dep. Tr. 66:1-11, Nov. 16, 2017).

anything that she perceived to be against ADP's or TBW's policies, that she thought was wrong, or that she thought was against TBW's interests.  Indeed, when Ms. Potter-Levane worked at TBW, she had no knowledge of any fraud taking place at TBW.[105]

ADP never deviated from its established policies, practices, and procedures throughout its relationship with TBW in its processing of the TBW Entities' payroll and its handling of the Payroll Funds.[106]  ADP's handling of the TBW Entities' payroll was consistent with industry standards.[107]

## DISCUSSION

*Summary Judgment Standard*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[108]  In this context, "[a] genuine factual dispute exists only if a reasonable fact-finder 'could find, by a preponderance of the evidence, that the [non-movant] is entitled to a verdict [in its favor].'"[109] Though all reasonable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-movant, "inferences based upon speculation are not reasonable."[110]

The moving party bears the initial burden of articulating the basis for its motion and identifying evidence which shows that there is no genuine issue of material fact.[111]  Thereafter, the

---

[105] Doc. 168, Ex. 67 (Potter-Levane Dep. Tr. 107:22–109:20, 134:25-135:8, Nov. 16, 2017).

[106] Doc. 168, Ex. 70 (Jimenez Dep. Tr. 145:20-146:19, Mar. 13, 2018).

[107] Doc. 168, Ex. 71 (Jimenez Dep. 149:2-22, 150:10-15, 151:9-152:14, 154:18-156:3, 166:17-167:8, 174:7-175:3, Mar. 13, 2018).

[108] *Celotex Corp. vs. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c) (1963) (later amended and relocated, in part, to 56(a)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see generally* Fed. R. Bankr. P. 56(a) (made applicable to this proceeding by Fed. R. Bankr. P. 7056).

[109] *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson*, 447 U.S. at 252).

[110] *Id.* (quoting *Marshall v. City of Cape Coral*, 971 F.2d 1558, 1559 (11th Cir. 1986).

[111] *See, e.g.*, *Celotex*, 477 U.S. at 322–23; *Kernel Records Oy*, 694 F.3d at 1300.

burden shifts and the non-moving party must set forth specific facts showing that there is a genuine issue for trial.[112]  In so doing, the non-moving party may not rely on the "mere allegations or denials of [its] pleadings."[113]  And "[a] mere scintilla of evidence in the form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not significantly probative of a disputed fact cannot satisfy [the non-moving] party's burden."[114]

### Is ADP a Mere Conduit?

The parties have filed three separate motions for partial summary judgment on ADP's mere conduit defense.[115]  The disputed issue is whether ADP is an initial transferee from whom the Trustee can recover under § 550.  To establish its mere conduit defense, ADP must prove that:  (i) it did not have control over the funds received from TBW, *i.e.* that ADP merely served as a conduit for the funds that were under the actual control of TBW; and (ii) it acted in good faith and as an innocent participant in the fraudulent transfers.[116]  The court first considers the control prong of ADP's mere conduit defense.

### The Control Prong

A defendant is an initial transferee only if it "exercise[s] legal control over the assets received, such that [it] ha[s] the right to use the assets for [its] own purposes, and not if [it] merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee."[117]  Indeed, "a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in

---

[112] *Kernel Records Oy*, 694 F.3d at 1300.

[113] *Marshall v. City of Cape Coral*, 971 F.2d 1558, 1559 (11th Cir. 1896) (quoting Fed. R. Civ. P. 56(e) (1963) (later amended and relocated, in part, to 56(c))); *see generally* Fed. R. Bankr. P. 56(c) (made applicable to this proceeding by Fed. R. Bankr. P. 7056).

[114] *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1320 (M.D. Fla. 2015), *aff'd*, 677 F. App'x 573 (11th Cir. 2017); *see also Anderson*, 477 U.S. at 249–50; *Kernel Records Oy*, 694 F.3d at 1301.

[115] Docs. 137, 135, 156, 158, 157, 160, 161, 167, 168, 173 and 175.

[116] *Harwell*, 628 F.3d at 1323.

[117] *Pony Express*, 440 F.3d at 1300 (citations omitted).

respect of the challenged transaction, it not an initial transferee within the meaning of § 550(a)(1)."[118]

The lack of control of by a bank over a deposit account is the quintessential example of a mere conduit.  Still, a bank/customer relationship is nothing more than a debtor/creditor relationship.[119]  No physical accounts exist.  All deposited funds are commingled and owned by the bank.  The bank in turn has a contractual obligation to repay the money on demand, or to make payments by wire or check, as instructed by its customer.  Banks also use customer deposits to make loans or investments for the bank's own profit.  This is the very essence of banking.  And yet, these well-known attributes do not disqualify a bank from being a mere conduit.[120]

*Société Generale* stands for the rule that when a bank receives money into a customer account, it never has legal control of the funds.[121]  There, the Eleventh Circuit distinguishes a transfer into a deposit account from a transfer earmarked for payment of a bank loan.  The bank is a mere conduit with respect to an unrestricted deposit account and even the existence of an overdraft does not defeat this status.[122]  But, when a bank receives money from a debtor to pay off a loan, it exercises actual control over the funds.  Accordingly, a bank does not act as a mere conduit when it accepts loan payments.[123]  Cautioning that consideration of control in this context

---

[118] *Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 59 (2d Cir. 1997).

[119] *See N.Y. Cty. Nat'l Bank v. Massey*, 192 U.S. 138 (1904); *Vassar v. Smith*, 134 Fla. 346, 350 (1938) ("When a general deposit with a bank is made the depositor parts with the title of the deposit and in the absence of a special agreement imparting a different character, the relationship between the parties is simply that of debtor and creditor.").

[120] *See In re Custom Contractors*, 745 F.3d at 1350-1352; *Société Generale*, 848 F.2d 1196; *see also Wiand*, 86 F. Supp. 3d at 1329-31.

[121] *Société Generale*, 848 F.2d at 1200.  Interestingly, the Fourth Circuit takes a different approach to reach the same conclusion.  In the Fourth Circuit, a deposit into an unrestricted bank account deemed not to be a transfer under § 101(54) of the Bankruptcy Code.  *See, e.g, Ivey v. First Citizens Bank & Trust (In re Whitley)*, 845 F.3d 205, 210 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 314 (2017).  Thus, in the Fourth Circuit, the burden of proof is on the plaintiff to establish the transfer as part of its prima facia case.  Conversely, the "mere conduit" defense crafted by the Eleventh Circuit is an affirmative defense for which the defendant must bear the burden of proof.

[122] *Société Generale*, 848 F.2d at 1196.

[123] *Id*. at 1200; *see also Bonded Financial Services v. European American Bank*, 838 F.2d 890 (7th Cir. 1988).

must be logical and equitable, the Eleventh Circuit also instructs that "[i]t is especially inequitable to hold conduits liable in situations where conduits cannot always ascertain the identity of the transferor."[124]

ADP argues that the relevant attributes of its business model are like those of a bank. ADP aggregates Client Funds in a common account and uses a general ledger control system to account for each client's funds. The MSA expressly permitted ADP to commingle TBW's funds with the funds of other ADP clients. The MSA also permitted ADP to invest the funds received from TBW and to keep any income earned for ADP's own benefit.

Like a bank, ADP also may use money from the commingled Client Funds to make loans to other ADP clients. If an ADP customer has a shortfall for its payroll obligations, ADP can satisfy that client's obligation by drawing from the commingled Client Funds. This is not unlike an overdraft, except that ADP does not charge interest to its clients or otherwise profit from a payroll shortfall that is temporarily covered with commingled Client Funds.

While ADP's business model is akin to a bank operating account, TBW's control over its Client Funds is comparable to a bank customer directing payments by issuing checks or wire transfers from its operating account. TBW's Payroll and HR Departments directed and controlled the money transferred to ADP for the payment of employee wages, taxes and garnishments. And much like a bank, ADP was contractually obligated to honor those instructions.

Initially, the Trustee's response to ADP's bank analogy is compelling. He argues that banks are different because (i) banks are extensively regulated and (ii) banks have an obligation to

---

[124] *Société Generale*, 848 F.2d at 1200-01.

return their customer's money.[125]    The court agrees that these are notable differences, but on reflection they are not enough to disqualify ADP as a mere conduit.[126]

With respect to bank regulation, the Trustee does not identify any specific regulation to distinguish a bank's lack of control over deposited funds from ADP's business model.  Rather, the Trustee refers vaguely to regulations controlling a bank's use of customer deposits.  ADP responds that it has a contract that similarly controls the use and direction of Client Funds.  But more importantly, the cases recognizing banks as "mere conduits" do not rely on, or even mention, any state or federal regulations to support their conclusion.  Rather, they focus on the customer's ultimate control over the money in the "account" – withdrawal at will or directing payment by check, wire or electronic transfer – or on the policy implications of requiring a bank to question the source of a customer's deposit.[127]

Other than perhaps its legal obligations for withholding and paying taxes under the Internal Revenue Code and applicable state tax laws, ADP admittedly is not subject to laws and regulations in the same way as a state or national bank.  But the critical inquiry, as explained by the Eleventh Circuit, is TBW's ultimate control over the funds wired to ADP.[128]  Moreover, because this is essentially an equitable analysis, ADP's contractual obligation to honor TBW's directions should also qualify for mere conduit status, if sufficiently rigid and followed.

Under the terms of the MSA, and as implemented by the parties, TBW, through its Payroll and HR Departments, always directed and maintained control of its payroll.  TBW made all payroll

---

[125] Doc. 137, pp. 3-4, 11.
[126] *See Custom Contractors*, 745 F.3d at 1350-1351.
[127] *See generally Furr v. TD Bank, N.A., (In re Rollaguard Security*, Ch. 7 Case No. 14-38071-EPK, Adv. Nos. 16-01744-EPK, 16-01756-EPK and 16-01757-EPK, 2018 WL 4742098 (Bankr. S.D. Fla. Oct. 1, 2018)(collecting and summarizing bank deposit transfer cases).
[128] *See Custom Contractors*, 745 F.3d at 1350-1351.

decisions, and TBW did not share its internal operations and allocations with ADP. TBW simply outsourced its payroll processing to ADP.

ADP also had contractual obligations to, and, in fact, did return money to TBW on demand. TBW gave ADP instructions, including specific bank account information, for this express purpose. The MSA permitted TBW to stop payment of ADPChecks (employee paychecks) within 24 hours. TBW also had the ability to reverse Full Service Direct Deposits (direct deposit of employee pay) up to five business days from the payroll check date. ADP also returned payroll funds received from TBW that were never cashed by employees.

In short, ADP's contractual obligations are analogous to a bank's obligations when it accepts money into a deposit account. But "mere conduit" status is not limited to a bank. ADP's contractual obligation to remit funds to satisfy its clients' payroll and tax obligations also has many of the same attributes of the defendant in *Pony Express* who the Eleventh Circuit also found to be a mere conduit.

*Pony Express,* [129] involved an insurance broker who arranged for insurance coverage for clients and then billed the clients for the premiums. The broker received and deposited client funds into a trust account and then remitted payments to the insurance company, less a commission for the brokerage service. Sometimes, the broker would advance funds to the insurance company to be sure that the policies did not lapse. No interest or other fee was charged for this temporary "loan." Client funds were commingled in the broker's trust account, but the broker did not commingle its own money with that of its clients.

Pony Express contracted with the broker to arrange for insurance and was billed and paid for premiums due over the course of several months. The broker then received a check from Pony

---

[129] *Pony Express,* 440 F. 3d 1296 (11th Cir. 2006).

Express for of $310,422 which it deposited in its client trust account. The next day the broker issued checks to Pony Express' insurance carriers for insurance premiums. Unbeknownst to broker, Pony Express was in serious financial difficulty and its check bounced, twice. To correct the deficiency, Pony Express wired the full amount of the check directly into the broker's client trust account. Two days later, Pony Express filed for bankruptcy. Pony Express filed a complaint against the broker to recover the wire transfer as an avoidable preference. In response, the broker claimed to be a mere conduit.

In analyzing the broker's status as a mere conduit, the Eleventh Circuit initially focused on whether the broker was a creditor at the time of the transfer. After all, the broker had already advanced payment of the insurance premiums when Pony Express' check bounced. Still, like the bank with an overdraft, the broker was deemed a mere conduit of the funds transferred to it. The court reasoned that the broker "did not intend to become a creditor" when it sent checks to the insurance carrier. The broker also had "every expectation" that the funds would be immediately forthcoming. The fact that the funds came three weeks later was deemed not to have "dispositive significance." The temporary deficiency was ultimately cured, and this was enough to satisfy mere conduit requirements.[130]

The broker's position as an agent and fiduciary is a factor in the analysis of whether the broker exercised legal control over the funds transferred to it. The funds were "earmarked" for the insurance premiums and subject to the broker's legal duty to use those funds as instructed and as required under California law. Thus, the court explains that the mere conduit test "takes on special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor . . . who are duty-bound to take only limited actions with respect to the funds

---

[130] *Id*. at 1302-1303 (discussing *Société Generale*, 848 F.2d 1196).

received."[131]  But ultimately, "the control test turns on the recipient's legal rights and obligations toward the transferred assets, not simply their legal relationship with the debtor-transferor or the ultimate use of the assets."[132]  A fiduciary relationship can place limits on control, use of a trust account might as well, but so might contractual obligations.  The bottom line is that each assertion of a mere conduit defense must be considered on its own facts.

To the extent that ADP held a limited power of attorney for payroll tax services under the MSA, ADP has some attributes of a fiduciary.[133]  The Transfers were always subject to ADP's contractual obligation to "apply such funds to satisfy [TBW's] filing obligations covered by the Tax Filing Services."[134]

But the essence of the transactions between TBW and ADP is simply that ADP was obligated to use TBW's Client Funds to pay wages, garnishments, and taxes as directed by TBW. TBW's control over the Client Funds was facilitated by PayForce and was implemented by TBW's HR Department.  ADP always followed TBW's instructions in moving Client Funds to the tax authorities, designated employees, and respective garnishors.[135]  The funds merely passed through ADP to the intended recipients, and the short time that they spent in ADP's Client Funds account does not change this fundamental fact.

The court is directed to consider all aspects of the transactions between TBW and ADP in this "flexible, pragmatic, equitable approach."[136]  The logical extension of such an approach is that no single factor is dispositive.  Instead, the court must step back and be logical and fair in determining whether an initial transferee has legal control of the transfers within the meaning of

---

[131] 440 F.3d at 1300-01.

[132] *Id*. at 1301.

[133] Doc. 157, Ex. C (MSA Annex C § 1.2).

[134] Doc. 157, Ex. C (MSA at Annex C, § 1).

[135] This lack of control over Client Funds is in contrast to the control ADP exercises over the ADP Funds account where payments for services rendered are deposited.

[136] *Custom Contractors*, 745 F.3d at 1350.

the mere conduit defense. Here, the court finds that the undisputed facts establish that ADP did not control the Transfers and it is neither logical nor equitable that ADP be held liable for the funds that passed through ADP to employees, taxing authorities and garnishors. Accordingly, the Trustee's motion for partial summary judgment will be denied, and ADP's cross-motion for partial summary judgment on the control element of its mere conduit defense will be granted.

*The Good Faith Prong*

But lack of control is not enough to establish mere conduit status in this circuit. ADP must also prove that it acted in good faith and as an innocent participant in the fraudulent transfers.[137] To rebut, the Trustee must show that ADP had actual knowledge of TBW's fraudulent purpose in making the Transfers or had knowledge of facts or circumstances that would have put ADP on inquiry notice.[138]

Nothing in the record suggests that ADP had actual knowledge of TBW's financial condition or Farkas's fraudulent conduct until the FBI raided TBW's offices in August 2009. In challenging ADP's good faith, the Trustee instead identifies certain "red flags" that he argues should have put ADP on inquiry notice.

First, the Trustee argues that ADP breached the MSA because it paid employees of TWB's subsidiaries and affiliates that were unrelated to mortgage banking.[139] The Trustee overstates his

---

[137] *Welch v. Regions Bank (In re Mongelluzzi)*, 587 B.R. 392, 411 (Bankr. M.D. Fla. 2018) ("*Mongelluzzi*") (citing *In re Pearlman*, 440 B.R. 900, 906 (Bankr. M.D. Fla. 2010)).

[138] *Id.*

[139] In opposing summary judgment, the Trustee relies in large part on the deposition testimony of Donald Workman. Mr. Workman is an attorney who represented the chairman of the Creditor's Committee in the chapter 11 cases. Although knowledgeable, Mr. Workman's involvement in these cases obviously came after the bankruptcies were filed in 2009. He has no direct personal knowledge of the events occurring before TBW filed bankruptcy. His testimony is more of a summary of all that he has heard from others and what he, the Trustee, and the attorneys for the Trustee, have been able to uncover well after the fact, as well as his interpretation of the three emails discussed below. Although "deposition testimony may be considered even if it does not meet the requirements of Fed. R. Civ. P. 32(a) (Using Depositions in Court Proceedings), the testimony must meet the requirements of an affidavit pursuant to Fed. R. Civ. P. 56 in that the testimony is sworn, competent, based upon personal knowledge, and sets out facts that would be admissible at trial." *Comprehensive Care Corp. v. Katzman*, No. 8:10-CV-942-T-27TGW, *4 (M.D. Fla. July 21, 2011). "An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the

case and, certainly has not pursued a breach of contract claim against ADP. Notwithstanding that

none of the TBW Entities (other than TBW) are actually listed on Annex Z, it is undisputed that

Farkas, Ms. Potter-Levane, and ADP intended and understood that from the outset, pursuant to the

MSA, ADP would provide Payroll Services to all the TBW Entities under a single contract. Ms.

Potter-Levane, TBW's principal contact with ADP, rejected any suggestion that ADP operated

outside the MSA by providing Payroll Services to the TBW Entities. But perhaps more telling is

TBW's three-and-a-half years of performance and payment under the MSA.[140] If nothing else,

TBW's performance raises the specter of ratification.

Second, the Trustee argues that ADP breached the MSA because it failed to demand that

the MSA be approved by TBW's board of directors. The Trustee does not point to any legal

requirement for board approval. But, even if he is correct, such approval presumably should have

occurred in May 2005 when the MSA was originally signed. The reason this argument still fails

is that the MSA was signed by Farkas as TBW's "Chairman of Board/Secretary." It is undisputed

that Farkas controlled TBW in 2005 and his title certainly implies enforceable apparent

authority.[141] Accordingly, the Trustee's breach of contract arguments make little sense when

viewed in light of undisputed facts.

On the issue of inquiry notice, the Trustee challenges ADP's good faith based on its failure

to investigate three emails, the contents of which the Trustee labels as "suspicious" and enough to

put ADP on notice that a "storm was a-brewin" over at TBW. An email dated October 20, 2005,

---

burden in a motion for summary judgment." *Id.* Although the court has addressed the arguments and issues raised by Mr. Workman, much of his recitation of pre-bankruptcy facts is necessarily based on hearsay and speculation.

[140] *See Elec. Mach. Enter., Inc. v. Hunt Constr. Grp, Inc. (In re Elec. Mach. Enter., Inc.)*, 416 B.R. 801, 886 (Bankr. M.D. Fla. 2009).

[141] *See In re Bryant Tool & Mfg., Inc.*, 16 B.R. 723, 725-26 (Bankr. S.D. Fla. 1982) (corporate debtor by its conduct estopped itself from denying its director/vice-president's apparent authority to represent and bind corporate debtor in execution of lease.)

from Trisha Russo, ADP's National Accounts District Sales Manager, to Robb Young, TWB's

Director – Human Resources, states:

> Robb –
>
> I was in the process of setting up an additional company code, per Margaret's request (via Javier Soto) for Chisholm Properties of Atlanta and I realized we never set up Lee's other companies up for time and labor.  For example, the Marion County Title Company…would you like the sub's to have access to Enterprise eTime via the web as well?  It is no problem setting them up; they would simply be put under the main TBW Enterprise eTime license/account.
>
> Let me know via reply email at your earliest convenience.  Thanks![142]
> A second mail dated November 2, 2005, from Javier Soto, ADP Implementation

Consultant, to Trisha Russo, states:

> Hi Trisha,
>
> I spoke with Jessica today and they just learned that they will not be needing co. code:  GCJ – NADA Airline after all.  It looks like those 4 employees need to be paid under TBW's FEIN for some reason.[143]

And a third, dated nearly three years later, on August 4, 2008, from Trisha Russo to Jessica

Vega at TBW, reads, in part:

> Hi Jessica!
>
> Hope you are doing well!  I have a request I was hoping you could assist me with.  My sales counterpart in Georgia is working on putting [REDACTED] on PayForce.  The Payroll Manager there, Tracy Vaughan, would like to speak with another Payroll Administrator that is processing restaurant employees on PayForce.  Immediately thought of TBW because of the restaurants that Lee owns and you process on PayForce.[144]

The first two emails were sent in 2005, almost four years before the FBI raid of TBW's

headquarters.  They are nothing more than communications between ADP and TBW during the

Client Group onboarding process as contemplated by the MSA.  ADP and TBW entered into the

---

[142] Doc. 156, Ex. B.
[143] *Id.*, Ex. C.
[144] *Id.*, Ex. D.

MSA on May 3, 2005.  They amended the MSA on October 1, 2005 to add an additional service, specifically Time and Labor Management Services.  The first email expressly refers to the implementation of this additional service, *i.e.* "we never set up Lee's other companies up for time and labor."

The third email was sent in 2008, but it does not reveal anything new.  Ms. Bush is simply asking for a recommendation based on ADP's work with a restaurant that Farkas owned.  Nada Restaurant Group (later known as Dine Design, Inc.) was signed up for Payroll Services in April 2005.  No reasonable inference can be drawn from the content of this email that it is suspicious or should have alerted ADP to a massive fraud that TBW's own auditors apparently missed.

The emails are, in the court's view, a red herring.  ADP does not dispute that it provided Payroll Services to TBW Entities.  The Payroll Services were requested by TBW and managed and directed by its HR, Payroll and Accounting Departments.  Large conglomerates often include different types of businesses.  And by every available measure, TBW was a growing and successful conglomerate when the MSA was signed.  Even the Dun & Bradstreet Report ADP ordered in May 2005 confirmed that TBW was financially sound.

ADP was hired to processes the payroll data TBW input into PayForce and provide related customer support.  ADP does not advise clients on how to operate their businesses – just payroll processing.  It is up to the client to decide what companies they open, who to pay, and how to pay those individuals.[145]  ADP has no legal or contractual obligation to review, evaluate, or audit its clients' transactional data,[146] nor should it.  TBW was responsible for the accuracy of its data

---

[145] Doc. 168, Ex. 73 (Bush Dep. Tr. 148:2-12, 153:11-13, Feb. 8, 2017; Rambo Dep. Tr. 61:17-19, Feb. 7, 2017; Jimenez Dep. Tr. 149:2-152:14, 154:18-156:3, 166:17-167:8, 174:7-175:3, Mar. 13, 2018).

[146] Doc. 168, Ex. 74 (Bush Dep. Tr. 193:2-7, Feb. 8, 2017; Jimenez Dep. Tr. 149:2-152:14, 154:18-156:3, 166:17-167:8, 174:7-175:3, Mar. 13, 2018; Walle Dep. Tr. 58:12-16, 61:16-19, 63:11-20, 88:9-20, Feb. 10, 2017).

under the MSA.[147]  Ms. Potter-Levane, among others, stated repeatedly that the reclassifications and reallocations occurred internally and were not shared with ADP.  Ms. Potter-Levane testified that after ADP received instructions on where to send funds received through its "fully automated" system, "ADP was out of the equation, because they had no reason to know anything else."

Finally, even if ADP had become suspicions as the Trustee suggests it should have been, what should ADP have done with the information?  Certainly, a thorough review of TBW's financial statements would not have detected fraud or insolvency.  TBW's books and records were not shared with ADP.  But from 2006 to 2008, apparently Deloitte certified the bona fides of TBW's ongoing financial condition. Inquiries to Ms. Potter-Levane would have been useless as she had no knowledge of the fraud.  And there is no evidence to suggest that Farkas was likely to confess his misdeeds to ADP.

The Trustee struggles to respond to this question, but finally lands on the answer that ADP should have gone directly to TBW's Board of Directors - a board not only controlled by Farkas but also in possession of TBW's (auditor-certified) rosy financial statements.  Moreover, as a result of TBW's internal reallocation process, the net balance due from each subsidiary or affiliate for funds advanced by TBW for payroll was reflected on TBW's general ledger, and on its consolidated financial statements and the TBW Board Financial Review reports. So, TBW's Board of Directors should have known what the Trustee argues ADP should have told them.

Admittedly, "good faith" is not usually an issue ripe for summary judgment.[148]  But here, the material facts are not in dispute and even favorable inferences do not help the Trustee.  It is a

---

[147] Doc. 168, Ex. 72 (TBW-ADP-1-00000003 (MSA, Annex A, § 2.2, "All Services will be based upon information provided to ADP by Client and Client is responsible for the accuracy and timely input of all such information.")).

[148] *See Wiand*, 86 F. Supp. 3d 1316 (Defendant bank's motion for summary judgment on mere conduit defense granted); *see also Kapila v. IRS (In re ATM Fin. Serv, LLC)*, 446 B.R. 564 (Bankr. M.D. Fla. 2011) (Defendant IRS's motion for summary judgment on control and good faith elements of mere conduit defense granted).

tough case to argue that the company handling the automated payroll should have acted where the TBW's Board of Directors and auditors failed to do so.

ADP has established its good faith and status as an innocent participant in the Transfers. The Trustee raises interesting theories and speculative possibilities, but ultimately not a triable issue. Accordingly, ADP is entitled to partial summary judgment on the issue of its good faith for purposes of its mere conduit defense.

## **CONCLUSION**

There is no doubt that TBW's creditors were victims of a massive fraud and that the Trustee has a responsibility to pursue all viable claims for the benefit of those creditors. But here, even if the Trustee can avoid the Transfers as fraudulent under state or federal law, ADP was a "mere conduit" and as such shielded from initial transferee liability under § 550.

The court separately will enter partial summary judgment in favor of ADP on Counts II – VI of the Complaint (seeking to avoid the Transfers) and on Count VII to the extent it seeks to recover the Transfers.[149]

---

[149] Because summary judgment is granted on the "mere conduit" defense, it not necessary to address the damages issues raised in ADP's motion for summary judgment.